**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 28, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JESIL ABRAHAM WILSON,

     Petitioner - Appellant

v.

STATE OF OKLAHOMA; JUSTIN
JONES; TULSA COUNTY,

     Respondents - Appellees

No. 08-5101
(N.D. Okla.)
(D.C. No. 4:02-CV-00323-CVE-PJC)

**ORDER AND JUDGEMENT**[*]

Before **O'BRIEN**, **BALDOCK,** Circuit Judges, and **BRORBY**, Senior Circuit Judge.

Jesil Abraham Wilson, a minor, was charged with First Degree Murder in adult court. The Oklahoma trial court denied Wilson's motion to be certified as a child and proceed in juvenile court (reverse certification). Wilson was convicted by a jury and sentenced to life imprisonment. He filed a 28 U.S.C. § 2254 federal habeas petition alleging ineffective assistance of counsel with respect to the reverse certification

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id*.

proceedings. The district court concluded his claim as to pretrial counsel[1] was procedurally barred and Wilson had failed to show ineffective assistance of appellate counsel constituted cause and prejudice to overcome the bar. We affirm.

## I.     FACTUAL BACKGROUND

The following facts derive mainly from the testimony of Officer Mark Brisbin, Detective Alvin McDonald and the victim's sister at the reverse certification hearing held on November 4, 1998.

At approximately 1:30 a.m. on January 3, 1997, 13-year-old Wilson and his cousin Zachary Ferguson went to Mitchell Knighten's apartment in Tulsa, Oklahoma, to retrieve a gun Knighten had taken from Wilson a few days earlier. Wilson knocked on the door, while Ferguson concealed himself around the corner. Knighten's sister answered the door. Wilson asked her to get her brother; Knighten then came to the door. Wilson demanded the gun from Knighten. When Knighten did not return the gun, Ferguson emerged from around the corner and fatally shot Knighten. Wilson and Ferguson fled the

---

[1] Wilson had at least five different attorneys: (1) Cliff Stark who represented him in juvenile court at the adult certification hearing; (2) Michael French who represented him in adult court at the reverse certification hearing; (3) Gregg Graves who was appointed after French withdrew; (4) David Phillips who represented him at trial and sentencing; and (5) Kimberly Heinze who represented him on appeal. Phillips was retained by Wilson; Stark, Graves and Heinze were court-appointed. Wilson says French was appointed by the court but other evidence in the record indicates he may have been retained. In particular, one of the reasons French gave for withdrawing was "[Wilson's] family . . . has decided not to honor their financial obligations and has refused to pay for trial work." (R. Vol. I, Doc. 43-5 at 2.) Our reference to pretrial counsel in this order and judgment refers to French.

scene.

Police officer Mark Brisbin responded to the shooting and took a formal statement from Knighten's sister. While she was giving her statement, Wilson, Ferguson and Kelvin Kelly arrived in a car. Knighten's sister observed Wilson and Ferguson get out of the car, pointed at them and said, "Hey, there they are." (Appellant's Reply Br., Ex. 1 at 22.) Brisbin, allegedly at gunpoint, handcuffed Wilson and Ferguson and placed them in a patrol car. Kelly, who did not get out of the car, was also detained.

Detective Alvin McDonald also responded to the scene. He identified Wilson, Ferguson and Kelly as witnesses; they were transported to the police station where McDonald interviewed them. Kelly said Ferguson had shot Knighten and Wilson was with Ferguson at the time of the shooting. Ferguson denied any involvement in the murder. Wilson initially denied involvement but eventually admitted he was with Ferguson at the time Knighten was shot. He then said he shot Knighten once and Ferguson shot Knighten twice. Based on these statements, McDonald no longer considered Wilson a witness but rather a suspect. He stopped the interview and called Wilson's mother.

When Wilson's mother came to the police station, McDonald presented both Wilson and his mother with a form explaining Wilson's rights. It provided:

BEFORE WE ASK YOU ANY QUESTIONS YOU MUST
UNDERSTAND YOU HAVE THE FOLLOWING RIGHTS

1.    You have the right to remain silent.

2.    Anything you say can and will be used against you in court.

3. You have the right to talk to a lawyer before we ask you any questions and you have the right to have him with you during the questioning.

4. If you cannot afford a lawyer and want one, the court will appoint one for you before you are asked any questions.

5. If you want to answer questions now without a lawyer present you may do so. You have the right to stop answering questions at any time. You may consult a parent/guardian in private concerning these rights before making a decision concerning these rights.

6. You are advised that under Oklahoma law there is a possibility that you may be certified and tried as an adult for this offense.

(R. Vol. I, Doc. 36-7 at 1.) According to McDonald's testimony, he read these rights to Wilson and his mother.

The form also contained a "WAIVER" section stating: "I am the parent/guardian of the above named juvenile. I have read the above rights and have had the opportunity to ask any questions concerning these rights." (*Id.*) Under this section, three statements appeared: (1) "I have had the opportunity to confer with the juvenile in private concerning these rights"; (2) "I want the juvenile to answer questions or make a statement at this time"; and (3) "I do not want the juvenile to answer questions or make a statement at this time." (*Id.*) Before each statement is a box. Wilson and his mother checked the box in front of the second statement and signed the form.

After signing the form, Wilson told McDonald he and Ferguson went to Knighten's house to retrieve Wilson's gun which Knighten had taken from him. The plan was to first get Knighten outside the apartment. Once Knighten was outside, Wilson's "job" was to retrieve the gun. (Appellant's Reply Br., Ex. 1 at 33.) If he did not retrieve the gun, he was to step back, thereby signaling to Ferguson to shoot. "[T]he

- 4 -

plan was to fix it where Mr. Knighten would never walk again, paralyze him" if he did not return the gun.  (*Id.* at 32.)  McDonald asked Wilson how he felt about Knighten being dead; Wilson said "he didn't care."  (*Id.* at 34.)  When asked why he had earlier said he shot Knighten, Wilson responded: "[T]o take some of the heat off of [my] cousin, [Ferguson], cause [Ferguson] was going to be going to prison for him for a long time." (*Id.* at 44.)

## II.        OKLAHOMA LAW

In Oklahoma, a 13-year-old charged with having violated any state statute or municipal ordinance is normally tried in a juvenile proceeding.  *See* Okla. Stat. Ann. tit. 10, §§ 7301-1.3(4), 7303-4.3(A).[2]  However, if the offense would be a felony if committed by an adult, the juvenile court, on its own motion or at the request of the district attorney, may seek to certify the juvenile to stand trial as an adult (adult certification).  In such circumstances, the juvenile court must first conduct a preliminary hearing to determine whether there is prosecutive merit to the charge.  *Id.* § 7303-4.3(B). If so, the court must continue the hearing to determine if the juvenile should be held accountable for his acts as if he were an adult (adult certification).  *Id.*  In making this determination, the court considers such factors (not listed in order of importance) as the seriousness of the alleged offense to the community; whether it was committed in a

---

[2] All citations to the Oklahoma statutes are to the 1996 version in effect at the time of Wilson's offense.  *See Bowman v. State*, 789 P.2d 631, 631 (Okla. Crim. App. 1990) ("It is a well established rule of law that the appropriate criminal penalty is the penalty in effect at the time the defendant commits the crime.").

violent or premeditated manner; the nature of the alleged offense; the maturity of the child and his ability to distinguish right from wrong; the juvenile's previous record; the prospects for adequate protection of the public and the likelihood of rehabilitating the juvenile in the juvenile system; and whether the offense occurred while the juvenile was escaping. *Id.* If the court decides adult certification is warranted, the juvenile proceeding will be dismissed and an adult criminal proceeding will be commenced against the juvenile. *Id.*

In certain circumstances, a juvenile is automatically considered an adult based on his age and the nature of the crime. *Id.* § 7306-1.1 (A), (B). Relevant here, a 13-year-old charged with First Degree Murder is required to be considered as an adult; no certification hearing is required. *Id.* § 7306-1.1(B) ("Any person thirteen . . . years of age who is charged with murder in the first degree shall be considered as an adult."). However, the juvenile may file a motion for certification as a child (reverse certification) before the start of the preliminary hearing. *Id.* § 7306-1.1(E). At the conclusion of the State's evidence at the preliminary hearing, the juvenile may offer evidence to support his reverse certification motion. *Id.* In deciding the reverse certification motion, the court must give consideration to the following factors listed in order of importance: (1) whether the offense was committed in an aggressive, violent, premeditated or willful manner; (2) whether the offense was against persons or property; (3) the record and past history of the juvenile; and (4) the prospects for adequate protection of the public if the accused person is processed through the juvenile system. *Id.* If the court grants the motion, the charge will be expunged and the case will proceed in the juvenile division of the district court.

*Id.* § 7306-1.1(F).  This case involves both an adult certification and a reverse certification proceeding.

### III.      WILSON'S STATE JUVENILE COURT PROCEEDINGS

In September or October 1997, Wilson was charged as a juvenile with Accessory to First Degree Murder.[3]  Cliff Stark was appointed to represent him.  The case was assigned to District Court Judge Chappelle.  On July 30, 1998, Judge Chappelle held a hearing and found prosecutive merit to the charge.

It is unclear from the record whether the State moved for adult certification or whether Judge Chappelle did so *sua sponte*.  In any event, on September 17, 1998, Judge Chappelle held another hearing to determine whether Wilson should be certified to stand trial as an adult.  He concluded Wilson should be so certified.  In doing so, he considered the factors set forth in Okla. Stat. Ann. tit. 10, § 7303-4.3(B) , finding: (1) the offense was committed in an aggressive, violent, premeditated and willful manner against a person and resulted in the loss of a person's life; (2) Wilson had a fair understanding of appropriate social behavior, was capable of making adequate decisions about social situations, and was capable of understanding right from wrong; (3) Wilson minimized responsibility for his actions and lacked respect for other people and property; (4) while Wilson had only a few previous contacts with law enforcement, his mother had recently

---

[3] Accessory to First Degree Murder is not an offense for which a juvenile is automatically considered an adult.  *See* Okla. Stat. Ann. tit. 10, § 7306-1.1(A), (B).

obtained a protective order against him,[4] he had been referred to law enforcement for possessing marijuana and trespassing, and the assistant district attorney (ADA) had stated he was a suspect in two other homicides; (5) according to Dr. Cooper, who performed a psychological evaluation on Wilson, there was only a slight chance for adequate protection of the community should Wilson be placed in a medium or secure facility; and (6) there were facilities available for Wilson's placement within the juvenile system. While the last factor weighed in favor of Wilson (*i.e.*, against certification), Judge Chappelle stated he was "most concerned" with the nature of the charge, Wilson's lack of remorse, and the calculated design and planning used to carry out the crime "confessed to by [Wilson]." (R. Vol. I, Doc. 1 at 46.) Judge Chappelle's order certifying Wilson for adult prosecution was immediately appealable, a remedy Wilson did not pursue. *See* Okla. Stat. Ann. tit. 10, § 7303-4.3(E).

## IV. WILSON'S STATE ADULT COURT PROCEEDINGS

On September 21, 1998, as a result of Judge Chappelle's certification order, the

---

[4] On June 25, 1998, Wilson's mother sought and obtained an emergency protective order against Wilson. In her petition for a protective order, she alleged:

> My son told me he would kill me if I tried to have him locked up. He was yelling at me in my face. He raised his hand to hit me. He said he would have me killed. I suspect he is in a gang, so I take his threats seriously. In the past, he has beaten me to the ground. He kicked me, hit me with his fists and tried to strangle me. He did this because I tried to get him to wake up and go to his juv[enile] court hearing. He has a long juv[enile] record.

(R. Vol. 1, Doc. 1 at 56.)

State charged Wilson with Accessory to First Degree Murder in adult court. The case was assigned to District Court Judge Singer. A month later, the State filed an amended information against Wilson adding First Degree Murder[5] to the pending Accessory to First Degree Murder charge. Wilson filed an application for reverse certification.

On November 4, 1998, Judge Singer held a hearing on the reverse certification application as well as a preliminary hearing to determine whether there was probable cause to believe a crime was committed and Wilson committed it. *See* Okla. Stat. Ann. tit. 22, § 258 ("The purpose of the preliminary hearing is to establish probable cause that a crime was committed and probable cause that the defendant committed the crime."). Wilson was represented by Michael French at the hearing.

Judge Singer first heard evidence from the State concerning whether there was probable cause to bind Wilson over on the charges. The State called Knighten's sister, Officer Brisbin and Detective McDonald as witnesses. Relevant here, McDonald first testified as to the incriminating statements Wilson made to him after Wilson and his mother had signed the notification and waiver of rights form. He then testified as to the incriminating statements Wilson had made earlier, when he was only considered a witness, not a suspect (*i.e.*, before his mother was called and the notification and waiver of rights form was signed). French objected to the latter testimony under Okla. Stat. Ann.

---

[5] As stated previously, a 13-year-old charged with First Degree Murder is required to be tried as an adult. *See supra* at 5. Therefore, there was no need to hold an adult certification hearing on that charge.

tit. 10, § 7303-3.1, which, at the time Wilson made the statements, prohibited the admission of any information gained by the custodial interrogation of a child unless the interrogation occurred in the presence of a parent/guardian and the child and parent/guardian were advised of the child's rights. *See* Okla. Stat. Ann. tit. 10, § 7303-3.1 . Through a series of questions, the State clarified that McDonald did not consider Wilson to be in custody when he made the initial statements because he was only a witness and was free to leave.

At the conclusion of McDonald's testimony, Judge Singer asked for argument on whether there was probable cause to bind Wilson over for trial on the charges. French responded: "First, Your Honor, I have a question as to whether there [are] special considerations as to what merits the custodial—or what defines custodial interrogation as to a juvenile versus what would constitute custodial interrogation?" (Appellant's Reply Br., Ex. 1 at 47.) The court responded:

> I can't answer your question. If you have law to present or comments to make or to present to the Court, I would be glad to entertain it, take it under advisement. I will take motions to suppress as something that was requested instanter by you . . . . I'm assuming you're going to demur to the evidence, but go ahead and please make your argument.

(*Id.*) French said he would demur to the evidence.[6] Judge Singer then asked whether he

_____

[6] "A demurrer to the evidence (properly called a motion for a directed verdict) admits for the sake of argument the facts which the State's evidence tends to prove. If there is any competent evidence reasonably supporting the allegations of the charge, the demurrer should not be sustained." *See Renfro v. State*, 607 P.2d 703, 705 (Okla. Crim. App. 1980); *see also* BLACK'S LAW DICTIONARY 445 (7th ed. 1999) (a "demurrer to the evidence" is "[a] party's objection or exception that the evidence is legally

had any argument as to whether Wilson was in custody at the time he made the initial statements. French offered to put his argument in a motion to suppress but the court pressed him as to the nature of his objection. French said: "That . . . once [Wilson] was brought in a car over [to the police station], that this would have constituted custodial interrogation and [Wilson] himself was unaware of his liberty to leave the scene at any point in time." (*Id.* at 48.) The State argued to the contrary and Judge Singer took French's demurrer to the evidence as well as the probable cause issue under advisement.

Judge Singer then heard evidence on the reverse certification motion. Wilson called his mother and grandmother as witnesses. He also introduced Dr. Cooper's psychological report, which was prepared for the juvenile court. Among other things, it said:

> [Wilson had] been referred to juvenile court on two occasions for offenses related to violence or threats of violence to others. Aside from this, however, it does not appear that he has exhibited a consistent pattern of violence to others. He has been able to be managed without major difficulty . . . .
>
> There are a number of factors that suggest that [Wilson] will require a fairly intensive treatment effort to ensure positive results. He's the product of a somewhat chaotic family system and has been exposed to a certain degree of violence within his family . . . .
>
> There are several factors that suggest that he may respond favorably to treatment within the juvenile system. Those include minimal treatment in juvenile system thus far; he does not have an extensive juvenile record; and that his chronological age suggests that he would appear to have sufficient time to . . . appreciate those programs . . . .

---

insufficient to make a case").

(*Id.* at 69-70 (quotations omitted).)  The State introduced Wilson's juvenile record.

At the conclusion of the hearing, Judge Singer determined the State had established probable cause as to the Murder in the First Degree charge but not as to the Accessory to First Degree Murder charge.  Therefore, he dismissed the latter.  He denied the application for reverse certification.  In doing so, he "very seriously [and] painstakingly considered each of the [statutory factors], as one would be remiss not to with a 14-year old defendant, 13-year-old at the time of the crime, the seriousness of what he's facing if he's initiated into the adult system."  (Appellant's Reply Br., Ex. 1 at 69.)  He also referred to Judge Chappelle's previous order certifying Wilson as an adult on the Accessory to First Degree Murder charge, including the ADA's statements indicating Wilson was a suspect in two other murders.  Judge Singer concluded:

> Having viewed [Judge Chappelle's order] and weighed it against Dr. Cooper's  report and having looked at the juvenile profile of this defendant, I find numerous remarks, notations made by the juvenile workers, social workers, case workers . . . that [Wilson] doesn't really seem to care about what goes on, that he doesn't seem to have, what I call, fire in his belly to get better and make himself a decent human being and show remorse and show concern and attentiveness toward his behavior . . . .
>
> I think I would be remiss if I didn't in some way include that in my decision as to whether he would be amenable to rehabilitation.  It's a two-way street.  You may have the facility to be amenable to rehabilitation, a lock-down facility for several years of this juvenile's life, but the question then becomes, is he going to take advantage and respond to it? . . .  [I]s he going to be proactive and affirmative to the point where he responds to treatment?  And every indicator from his history shows he won't.
>
> Failing to make arrangements to be timely in his appearance before the juvenile officers and, additionally, what obviously is not perjured testimony . . . by [his] mother, a propensity to be violent and make threats that are very, very unusual and not what I would call consistent with most children his age, as far as killing her, knocking her down, kicking her.

> Now, taking all that evidence plus the testimony by, I know, a loving and doting grandmother and mother—which my heart goes out to you—but taking that and weighing it with the four factors [under the statute], I feel compelled and constrained by the laws that this young man needs to stand trial as an adult.

(*Id.* at 73-74.)  Oklahoma law allows for an immediate appeal from the denial of a reverse certification order, *see* Okla. Stat. Ann. tit. 10, § 7306-1.1(G) , but Wilson did not appeal.

Five days later, on November 9, 1998, French successfully moved to withdraw as Wilson's attorney because

> [Wilson's] family . . . has decided not to honor their financial obligations and has refused to pay for trial work.  In addition, attorney was not retained to defend against murder charges, has no experience in the defense of murder charges and as a result the defendant would be severely prejudiced as a result of an inexperienced attorney[.]

(R. Vol. 1, Doc. 43-5 at 2.)  Gregg Graves was appointed by the court to represent Wilson but ultimately he retained David Phillips as new counsel and proceeded to trial on July 9-10, 1999.  The jury found Wilson guilty of First Degree Murder and recommended a sentence of life imprisonment.  On August 19, 1999, he was sentenced in accordance with the jury's recommendation.

Wilson appealed to the Oklahoma Court of Criminal Appeals (OCCA).  His appointed counsel, Kimberly Heinze, argued: (1) the trial court improperly excluded evidence of Knighten's prior violent acts, which would have corroborated Wilson's self-defense arguments; (2) the trial court erred in failing to instruct on self-defense or defense of another; (3) there was insufficient evidence to establish Wilson as a principal to the crime charged; and (4) the cumulative effect of these errors deprived Wilson of a fair trial.  The OCCA affirmed on November 29, 2000.

- 13 -

## V. WILSON'S STATE POST CONVICTION PROCEEDINGS

On October 12, 2001, Wilson filed a petition for post-conviction relief in state court. He sought an evidentiary hearing and claimed: (1) ineffective assistance of appellate counsel based on counsel's failure "to raise a dead-bang reversible error on direct appeal" and (2) ineffective assistance of counsel at the preliminary and reverse certification hearing based on counsel's failure to, *inter alia*, file a motion to suppress the statements he made to law enforcement on the day of the murder (both before and after the notification and waiver of rights form was signed) and object to Judge Chappelle and Judge Singer's reliance on untrue statements from the ADA that he was a suspect in two other murders. (R. Vol. 1, Doc. 1 at 31.)

On February 1, 2002, the state trial court denied relief without a hearing. It concluded any claim already raised on direct appeal was barred from further review under the doctrine of *res judicata* and all claims capable of being but not raised on direct appeal were procedurally barred. As to the ineffective assistance of appellate counsel claim, the trial court concluded counsel was reasonably competent as she carefully selected legal issues to be raised on appeal and the fact the OCCA denied relief is not the test for determining the adequacy of legal representation.

On February 4, 2002, Wilson appealed to the OCCA. The OCCA affirmed on March 14, 2002, saying:

> Except for his claim of ineffective assistance of appellate counsel, the propositions of error asserted by [Wilson] in his post-conviction application either were or could have been raised in the direct appeal of his conviction. All issues not raised in a direct appeal that could have been raised are waived. *Webb v. State*, 1991 OK CR 38, ¶ 6, 835 P.2d 115. Further, any

- 14 -

claim that was raised and ruled upon by this Court on direct appeal is res judicata and may not be the basis of a post-conviction application. *Id.*

Moreover, those issues may not be the basis of this post-conviction application, unless [Wilson's] claim of ineffective [assistance of] appellate counsel provides sufficient reason for not asserting the issues on direct appeal. 22 O.S. 1991, § 1086 . . . . The fact appellate counsel fails to recognize or raise a claim, regardless of merit, is not and cannot alone be sufficient to establish ineffective assistance or to preclude enforcement of a procedural default . . . .

After a review of the record and argument presented . . ., we **FIND** [Wilson] has not established appellate counsel's performance was deficient or that the result of his appeal was not reliable and fair.

(R. Vol. 1, Doc. 36-3 at 49-50.)

## VI.     WILSON'S FEDERAL COURT PROCEEDINGS

On April 25, 2002, Wilson filed a timely 28 U.S.C. § 2254 petition for writ of habeas corpus claiming his counsel at the preliminary and reverse certification hearing (hereinafter pretrial counsel) was constitutionally ineffective for, *inter alia*, (1) failing to challenge statements Wilson made to law enforcement on the day of the murder and (2) failing to object to Judge Singer's reliance on Judge Chappelle's adult certification order because it contained (allegedly)[7] untrue statements of the ADA that Wilson was a suspect in two other homicides.

The district court denied the petition on June 21, 2005. Relevant here, it concluded the procedural ground relied upon by the OCCA to avoid reaching the merits of Wilson's ineffective assistance of pretrial counsel claim (*i.e.*, the failure to raise it on

---

[7] *See* discussion VII (B), *infra* at 45.

- 15 -

direct appeal) was an independent and adequate state procedural ground. Since the claim was procedurally barred, it could be considered only if Wilson showed "cause and prejudice" for the default or demonstrated a fundamental miscarriage of justice would result if his claim was not considered. Wilson did not offer any explanation for his failure to raise the issue prior to his state court petition for post-conviction relief. Nevertheless, the district court liberally construed his petition as alleging the ineffective assistance of his appellate counsel constituted "cause" for the default. However, since appellate counsel does not act deficiently in failing to raise a waived claim, the court concluded appellate counsel had not performed deficiently because Wilson waived any claim arising at the preliminary and reverse certification hearing by failing to appeal from the denial of reverse certification. Consequently, the alleged ineffective assistance of appellate counsel did not constitute "cause" to overcome the procedural bar.

Wilson successfully sought a certificate of appealability (COA) from this Court. *See Wilson v. Oklahoma*, 192 Fed. Appx. 755, 756-57 (10th Cir. 2006) (*Wilson I*) (unpublished). On August 17, 2006, we concluded the OCCA's analysis of the ineffective assistance of appellate counsel claim—"[t]he fact appellate counsel fails to recognize or raise a claim, regardless of merit, is not and cannot alone be sufficient to establish ineffective assistance or to preclude enforcement of a procedural default"— deviated from the controlling federal standard. *Id.* at 757. Therefore, it was not entitled to deference on habeas review. *Id.*

We also determined the district court's conclusion that appellate counsel was not ineffective for failing to raise a waived claim was erroneous:

- 16 -

> The analysis tacitly rests on an unduly constricted notion of appellate ineffectiveness, with the result that one omission by counsel is excused on the basis of yet another. The very circumstance relied on to negate the appellate ineffectiveness claim, *i.e.*, the failure to timely perfect an interlocutory appeal, could itself aptly fall within the heading of appellate ineffectiveness for procedural bar purposes even if the fault lies with [pretrial] counsel (or any other attorney representing petitioner during his trial proceedings) rather than the attorney who pursued an appeal following final judgment. Alternatively, viewed as a trial-level omission, [pretrial] counsel's failure to perfect an appeal from the [reverse] certification order was in any event a separate instance of allegedly deficient representation, distinct from the [reverse] certification process itself that would have been the subject of the interlocutory appeal [pretrial] counsel failed to take. Thus, it would have been open to challenge following final judgment, in the same manner as any other instance of trial counsel ineffectiveness . . . .
>
> In sum, the district court's threshold rejection of Wilson's allegations of ineffective assistance of appellate counsel, and its consequent disposition of the petition on the basis of procedural bar, cannot stand on its stated rationale. To hold otherwise would be to embrace the notion that one act of ineffective assistance is cancelled out—when it is in fact compounded—by a second act that forfeits direct review of the first, so that counsel ineffectiveness that prejudices the defendant both at the trial level and (through waiver) on appeal is not remediable.

*Id.* at 758 (citation omitted). Consequently, we reversed and remanded for further proceedings. *Id.* We declined to direct the district court to hold an evidentiary hearing, finding such direction would be "premature." *Id.* at 759.

On remand, the court appointed counsel for Wilson and called for further briefing. Without holding an evidentiary hearing, the district court again denied relief on May 13, 2008. Relevant here, the court concluded Wilson's ineffective assistance of pretrial counsel claim was procedurally barred. It also determined Wilson had failed to demonstrate the ineffective assistance of appellate counsel constituted cause to overcome the bar as appellate counsel was not ineffective for failing to raise the ineffective

- 17 -

assistance of pretrial counsel claim because the claim lacked merit. The district court also denied Wilson's request for a COA.

Wilson filed a combined request for a COA and an opening brief with this Court. He claimed he was entitled to a COA on the district court's conclusion that the ineffective assistance of appellate counsel did not constitute cause to overcome the procedural bar applicable to his ineffective assistance of pretrial counsel claim. We granted a COA, ordered additional briefing and granted Wilson's request for oral argument.

## VII.    DISCUSSION

Wilson concedes his ineffective assistance of pretrial counsel claim is procedurally barred. However, he argues the bar should be excused based on the ineffective assistance of his appellate counsel who failed to raise the ineffective assistance of pretrial counsel claim on direct appeal. Whether appellate counsel is constitutionally ineffective for failing to raise a claim requires us to examine the merits of the omitted claim:

> If the omitted [claim] is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted [claim] has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the [claim] is meritless, its omission will not constitute deficient performance.

*See Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). Consequently, in deciding whether appellate counsel was ineffective in failing to raise the ineffective assistance of pretrial counsel claim, we look to the merits of that claim.

Because the OCCA's analysis of Wilson's ineffective assistance of appellate counsel claim was contrary to federal law, it is not entitled to deference, *see Wilson I*, 192 Fed. Appx. at 757; *see also Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009), and the district court afforded none. We review the district court's legal conclusions de novo. *Douglas*, 560 F. 3d at 1170. We normally review a district court's factual findings for clear error. *Id*.; *see also Morris v. Burnett*, 319 F.3d 1254, 1268 (10th Cir. 2003). But where, as here, the district court's factual findings are based entirely on the state court record, we independently review that record. *Douglas*, 560 F.3d at 1170; *Morris*, 319 F.3d at 1268.

Wilson alleges pretrial counsel was constitutionally ineffective in failing to (1) move to suppress the statements he made to law enforcement on the day of the murder and (2) object to Judge Singer's reliance on Judge Chappelle's adult certification order, namely, the ADA's allegedly false statements that Wilson was a suspect in two other murders. To establish pretrial counsel's ineffectiveness, Wilson must show (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under the first prong, he must show counsel's representation fell below an objective standard of reasonableness considering all the circumstances. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered strong trial

strategy." *Id.* (quotations omitted).

Under the prejudice prong, "[i]t is not enough for the defendant to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. On the other hand, he is not required to establish "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A.      Statements to Law Enforcement

On the day of the murder, Wilson made statements to law enforcement both before and after he and his mother signed the notification and waiver of rights form. Detective McDonald testified to these statements (*i.e.*, Wilson's pre-*Miranda*[8] and post-*Miranda* statements, respectively) at the preliminary and reverse certification hearing. Wilson claims pretrial counsel was constitutionally ineffective for failing to move to suppress these statements.

1.      Pre-Miranda Statements

The district court concluded pretrial counsel was deficient in failing to move to suppress Wilson's pre-*Miranda* statements because they were taken outside the presence of his mother and prior to Wilson and his mother being advised of their constitutional

---

[8] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

rights in violation of Okla. Stat. Ann. tit. 10, § 7303-3.1(A).[9]  However, it concluded that

in light of the other evidence presented at the preliminary hearing, Wilson did not suffer

prejudice as a result of counsel's deficient performance.  It found significant that at a

motions hearing held approximately two months after the preliminary and reverse

certification hearing, the state court granted Wilson's motion to suppress the pre-*Miranda*

statements and therefore they were not introduced at trial.

Wilson agrees with the district court that counsel acted deficiently in failing to

move to suppress his pre-*Miranda* statements.[10]  He disputes, however, the court's

---

[9] As we will discuss, this statute requires the statements to have been obtained as a result of "custodial interrogation" and defines "custodial interrogation" as the "questioning of a child while that child is in law enforcement custody or while that child is being deprived of freedom of action in any significant way by a law enforcement officer . . . ."  Okla. Stat. Ann. tit. 10, § 7303-3.1(A).  The district court did not expressly determine whether Wilson's pre-*Miranda* statements were made in response to "custodial interrogation."  And the issue is disputed.  Detective McDonald testified that at the time Wilson made these statements, he was a witness and free to leave.  But Wilson says he was "handcuffed at the scene," "taken into custody at the scene at gunpoint," "told at the scene that [he] was under arrest," and remained handcuffed during interrogation at the police station.  (R. Vol. I, Doc. 43-2 at 3-5.)  However, because the State has not appealed from the district court's determination that reverse certification counsel was deficient for failing to challenge Wilson's pre-*Miranda* statements, we need not resolve the issue.

We also question whether pretrial counsel was deficient in failing to move to suppress the pre-*Miranda* statements.  The record shows he did object to those statements under § 7303-3.1(A) at the hearing and offered to brief the issue but was foreclosed from doing so when the judge pressed him for the basis of his argument, which counsel supplied, and decided the issue without briefing.

[10] As we will explain, statements taken in violation of § 7303-3.1(A) are not admissible at either a certification hearing or a preliminary hearing.  *See In re R.L.N.*, 603 P.2d 1149, 1150 (Okla. Crim. App. 1979) (preliminary hearing); *J.T.P. v. State*, 544 P.2d

- 21 -

prejudice analysis. He claims prejudice because the pre-*Miranda* statements were used by Judge Singer to find probable cause and to deny his motion for reverse certification.

We agree the district court's prejudice analysis is flawed. Just because Wilson's pre-*Miranda* statements were suppressed at trial does not lessen their possible impact on Judge Singer's reverse certification and probable cause determinations. But the suppression of the pre-*Miranda* statements is significant in a slightly different regard. A jury—without hearing his incriminating pre-*Miranda* statements—found Wilson guilty of First Degree Murder beyond a reasonable doubt. Therefore, even had pretrial counsel successfully moved to suppress Wilson's pre-*Miranda* statements at the preliminary and reverse certification hearing, it is unlikely Judge Singer would not have found probable cause—a significantly lesser standard than proof beyond a reasonable doubt—to bind him over for trial for First Degree Murder. *See State v. Smith*, 617 P.2d 232, 233 (Okla. Crim. App. 1980) ("[T]he preliminary hearing burden of proof is a lesser one than the standard for conviction . . . ."). That is because the judge, as well as the jury, heard Wilson's highly incriminating post-*Miranda* statements, which, as we discuss next, were properly admitted. Thus, we cannot say Judge Singer's probable cause determination would have been different had the pre-*Miranda* statements been suppressed; in other words, the admission of these statements, if error, was harmless error.

The same reasoning does not apply in evaluating the effect the pre-*Miranda*

---

1270, 1276 (Okla. Crim. App. 1975) (certification hearing); *see also Crisp v. Mayabb*, 668 F.2d 1127, 1134 (10th Cir. 1981).

statements possibly had on Judge Singer's reverse certification determination. But it does not appear Judge Singer relied on the pre-*Miranda* statements in denying Wilson's reverse certification motion. He did not directly refer to them in announcing his decision. However, he did read from Judge Chappelle's adult certification order. In that order, in addressing "the likelihood of reasonable rehabilitation of the juvenile if he is found to have committed the alleged offense, by the use of procedures and facilities currently available to the juvenile court," one of the statutory factors to be considered in an adult certification proceeding under Okla. Stat. Ann. tit. 10, § 7303-4.3(B), Judge Chappelle said:

> The Court finds that there are facilities available for placement for [Wilson] within the juvenile system. This weighs for [Wilson]. However, this Court is most concerned about the nature of this charge; Accessory to first degree murder, the lack of remorse shown by [Wilson], and the calculated design and planning in carrying out of this crime *confessed to by [Wilson]*."

(R. Vol. I, Doc. 1 at 46 (emphasis added).) But this reference to Wilson's confession clearly refers to his post-*Miranda* statements as his pre-*Miranda* statements did not contain any information concerning a design or plan. Because the post-*Miranda* statements were properly admitted, any effect the pre-*Miranda* statements had on Judge Singer's reverse certification decision was harmless.

Wilson has not shown he was prejudiced by pretrial counsel's failure to move to suppress his pre-*Miranda* statements. Consequently, counsel was not constitutionally ineffective.

2.     Post-Miranda Statements

Wilson argues his pretrial counsel was ineffective for failing to move to suppress

his post-*Miranda* statements because (1) they were made outside the presence of his mother in violation of Okla. Stat. Ann. tit. 10, § 7303-3.1(A) and (2) there was no valid waiver of his *Miranda* rights. The district court rejected both arguments. Wilson and his mother submitted affidavits on remand saying Wilson's mother was not present during Wilson's post-*Miranda* interrogation. The court concluded these affidavits, made more than eight years after the reverse certification hearing, were directly refuted by the hearing record which showed Detective McDonald "took steps" to comply with § 7303-3.1(A) 's requirement that Wilson's interrogation take place in the presence of a parent or guardian and not until after he and his mother were made aware of Wilson's constitutional rights. (R. Vol. I, Doc. 46 at 25-26.) Indeed, McDonald had them sign a notification and waiver of rights form prior to obtaining Wilson's statements. The court determined Wilson and his mother acknowledged they had read the *Miranda* rights and had had the opportunity to ask questions concerning those rights. They also checked the box beside the statement: "I want the juvenile to answer the questions or make a statement at this time." The court concluded:

> After considering the circumstances reflected by the record compiled at the time of the statement and the subsequent hearing, the Court cannot find that [reverse] certification counsel performed deficiently in failing to file a motion to suppress statements made by [Wilson] to Detective McDonald after his mother arrived at the police station and after receiving a *Miranda* warning and signing a rights waiver.

(R. Vol. I, Doc. 46 at 26.)

Wilson argues the district court's finding that McDonald "took steps" to comply with § 7303-3.1(A) is insufficient to demonstrate his mother was present during his post-

- 24 -

*Miranda* interrogation as required by that statute. He says the record does not show his

mother's presence for anything other than signing the notification and waiver of rights

form. He points to his and his mother's affidavits on remand which state she was not

present during his post-*Miranda* interrogation. Wilson also argues the court erred in

determining his waiver was knowingly and voluntarily made. Seeking to exploit a silent

record, Wilson says he did not knowingly or voluntarily waive his rights. He claims the

court failed to consider the totality of the circumstances, instead focusing on the mere

fact he and his mother signed a notification and waiver of rights form.[11]

> a)    *Mother's Presence*

At the time Wilson made the incriminating statements:

> No information gained by a custodial interrogation of a child nor any
> evidence subsequently obtained as a result of such interrogation shall be
> admissible into evidence against the child unless the custodial interrogation
> about any alleged offense by any law enforcement officer . . . is done in the
> presence of the parents, guardian, attorney, or legal custodian of the child.
> No such custodial interrogation shall commence until the child and the
> parents, or guardian, or other legal custodian of the child have been fully
> advised of the constitutional and legal rights of the child, including the right
> to be represented by counsel at every stage of the proceedings, and the right
> to have counsel appointed by the court if the parties are without sufficient

---

[11] The district court found Wilson had not challenged his pretrial counsel's failure to move to suppress his post-*Miranda* statements until remand. Wilson says the court is wrong. He claims he raised his post-*Miranda* statements in his § 2254 petition by citing to *Crisp v. Mayabb*, 668 F.2d 1127 (10th Cir. 1981), and challenging his "compelled incrimination." (Appellant's Reply Br. at 22.) It is Wilson who is in error. It is clear that when read as a whole, his reference to "compelled incrimination" in his § 2254 petition refers to his pre-*Miranda* statements. Nevertheless, because the district court addressed the issue, we will do the same.

financial means . . . .[12]

Okla. Stat. Ann. tit. 10, § 7303-3.1(A). This statute "clearly establishes an automatic and mandatory rule . . . .[;] [n]o custodial interrogation of a child may proceed until both the child and his parents have been fully advised of their constitutional and legal rights; nor may such interrogation be conducted outside the presence of the child's parent or guardian or attorney." *J.T.P.,* 544 P.2d at 1277. "Partial and substantial compliance is not sufficient . . . ." *Lane v. State*, 558 P.2d 1204, 1206 (Okla. Crim. App. 1977) (concluding juvenile's statement inadmissible where father was not present during interrogation because juvenile stated he would prefer to talk outside his father's presence and father consented to leaving the room); *see also Crook v. State*, 546 P.2d 648 (Okla.

---

[12] This statute only applies to a "child," which is defined as:

> any person under eighteen (18) years of age, except for any person sixteen (16) or seventeen (17) years of age who is charged with any crime specified in subsection A of Section 7306-1.1 of [this title], or any person thirteen (13), fourteen (14) or fifteen (15) years of age who is charged with murder in the first degree pursuant to subsection B of Section 7306-1.1 of [this title], or any individual who has been certified as an adult pursuant to Section 7303-4.3 of [this title] . . . .

Okla. Stat. Ann. tit. 10, § 7301-1.3(4). The OCCA has held that § 7303-3.1 does not apply to a juvenile who is arrested for a reverse certification offense because under those circumstances he is considered an "adult." *See Harris v. State*, 777 P.2d 1359, 1362-63 (Okla. Crim. App. 1989); *see also Highshaw v. State*, 758 P.2d 336, 340 (Okla. Crim. App. 1988). It is unclear for what offense Wilson was under arrest, if at all, when he made the post-*Miranda* statements. Had he been arrested for First Degree Murder at the time of the interrogation, he would not have been entitled to § 7303-3.1's protections. *Id.* We need not resolve the issue because even assuming § 7303-3.1 applies, Wilson has not shown his post-*Miranda* statements were taken in violation of the statute.

- 26 -

Crim. App. 1976) (same).  Statements taken in violation of § 7303-3.1(A) are not admissible against a child at a certification or preliminary hearing.  *See In re R.L.N.*, 603 P.2d 1149, 1150 (Okla. Crim. App. 1979) (preliminary hearing); *J.T.P.*, 544 P.2d at 1276 (certification hearing); *see also Crisp*, 668 F.2d at 1134.

Wilson claims his pretrial counsel was ineffective in failing to move to suppress his post-*Miranda* statements under § 7303-3.1(A)  because his mother was not present when they were made.  In an apparent attempt to create an issue of fact and obtain an evidentiary hearing on this issue, both he and his mother filed affidavits on remand saying she was not present during Wilson's post-*Miranda* interrogation.  These post hoc affidavits appear to be the product of cultivated retrospection.  They were made over 8 years after the preliminary and reverse certification hearing and, tellingly, were the first indication of any claim that Wilson's mother was not present during his post-*Miranda* interrogation.[13]  Those considerations aside, the question is whether the affidavits are refuted by the record produced at the time of the events and whether they even address the relevant issue, counsel's knowledge.

_____

[13] In his petition for state post-conviction relief, his appeal to the OCCA from the denial of his petition for state post-conviction relief and his federal habeas petition, Wilson cited to § 7303-3.1(A).  But his argument was always limited to claiming that because his statements were taken during "custodial interrogation" they were inadmissible under that statute.  Wilson also attached an affidavit from his mother to his petition for state post-conviction relief.  In that affidavit, his mother complained she was on various medications when she was called to the police station and claimed she was not made aware of her son's rights.  She never indicated, however, she was not present during Wilson's post-*Miranda* interrogation.

As the district court concluded, Wilson is only entitled to an evidentiary hearing if his "allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief."[14] *See Barkell*, 468 F.3d at 696. He is not entitled to habeas relief. And the reason why requires focus. Even if Wilson and his mother's affidavits were true and not contradicted by the record (a dubious proposition), Wilson would not be entitled to habeas relief because whether his mother was <u>in fact</u> present is not the operative question.

Understandably, Wilson has not argued his post-*Miranda* statements should have been suppressed because his mother was not present as required by Okla. Stat. Ann. tit. 10, § 7303-3.1(A). Indeed, such argument based solely on state law would not have been cognizable under § 2254.[15] Nor would the United States Constitution require suppression

---

[14] Because Wilson diligently sought an evidentiary hearing on his claims in state court, the district court properly determined 28 U.S.C. § 2254(e) did not apply. *See Barkell v. Crouse*, 468 F.3d 684, 693-94 (10th Cir. 2006). Therefore, the court proceeded to analyze whether Wilson was entitled to an evidentiary hearing under the pre-AEDPA standard. *Id.* at 693. Under this standard, a habeas petitioner is entitled to an evidentiary hearing in federal court "if (1) the facts were not adequately developed in the state court, so long as that failure was not attributable to the petitioner, and (2) his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Id.* at 696 (quotations omitted). Wilson satisfied the first requirement. Thus, whether he was entitled to an evidentiary hearing turned on whether he satisfied the second requirement. *Id.*

[15] *See* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*.") (emphasis added); *see also Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law.").

of the statements.[16]

Ingeniously, Wilson avoids those obvious problems by claiming ineffective assistance of counsel. And such a claim, even if based on counsel's failure to raise a state law issue, is cognizable under § 2254[17] because an ineffective assistance of counsel claim alleges a violation of the federal constitution, specifically, a criminal defendant's Sixth Amendment right to the effective assistance of counsel. *See Strickland*, 466 U.S. at 684-86. But focusing on the nature of the ineffectiveness claim, the question is not whether Wilson's mother was <u>in fact</u> present but rather whether pretrial counsel acted deficiently. And that question turns on <u>what counsel knew or reasonably should have known at the time of the alleged ineffectiveness</u>, *i.e.*, at the preliminary and reverse certification hearing.

Absent from the affidavits submitted by Wilson and his mother is any fact suggesting counsel knew she was not present. And while Wilson asserts pretrial counsel "never even asked [him] anything about what happened prior to [his] arrival at the police

---

[16] "The Supreme Court has never held that juveniles have a right to the presence of a parent or guardian during custodial interrogation . . . ." *See Blankenship v. Estep*, 316 Fed. Appx. 758, 760 (10th Cir. 2009) (unpublished). Unpublished decisions are not binding precedent. 10th Cir. R. 32.1(A). We mention *Blankenship* as we would any other non-precedential authority.

[17] *See, e.g., Bland v. Sirmons*, 459 F.3d 999, 1030-31 (10th Cir. 2006) (ineffective assistance of counsel claim based on counsel's failure to request jury instruction on voluntary intoxication under Oklahoma law); *Upchurch v. Bruce*, 333 F.3d 1158, 1164-65 (10th Cir. 2003) (ineffective assistance of counsel claim based on appellate counsel's failure to raise claim that defendant's conduct did not satisfy elements of Kansas' kidnapping law).

station," notably absent is any allegation that counsel failed to inquire about or investigate the circumstances surrounding his post-*Miranda* statements. (R. Vol. I, Doc. 43-2 at 6.) Since there is no allegation counsel knew or should have known Wilson's mother was not present during the interrogation (if, in fact, she was not), our analysis is simplified.

Indeed, the record suggests pretrial counsel believed Wilson's mother was present during the post-*Miranda* interrogation. Counsel was obviously aware § 7303-3.1(A) required the presence of a parent or guardian during custodial interrogation as he cited to it in objecting to McDonald's testimony concerning Wilson's pre-*Miranda* statements. Had counsel believed Wilson's mother was not present during the post-*Miranda* interrogation, his prior acts strongly suggest he would have objected under the statute. His silence is telling.

Moreover, the record demonstrates pretrial counsel's belief that Wilson's mother was present was patently reasonable. At the preliminary and reverse certification hearing, Detective McDonald testified on direct examination as follows:

Q. [T]ell me about where were you when you interviewed [Wilson].

A. In the detective division.

Q. Did you have a chance to have the mother present?

A. Yes, I did.

Q. And do you recall her name?

A. Miss Cinderella Wilson.

Q. Did you have an opportunity to read a Miranda Rights to the juvenile and the mother?

- 30 -

A.    Yes, we did.

Q.    And were they afforded the opportunity to sign a rights waiver?

A.    Yes, they did.

* * * *

Q.    I want to show you what's been marked as State's Exhibit No. 1. Can you identify that for me?

A.    Yes, I can.  This is a juvenile notification of rights.

Q.    And do you recognize the signatures?

A.    Yes, I do.

Q.    What are those signatures?

A.    Cinderella Ferguson, signature of parent-guardian; Jesil Wilson, signature of juvenile.

* * * *

Q.    Was there a box signed above their signatures?

A.    Yes.

Q.    What is that box?

A.    "I want the juvenile to answer questions or make statements at this time."

Q.    . . . At the top of that sheet, are those the Miranda Rights that were read to [Wilson] and the mother?

A.    Yes, it is.

Q.    And then what did they execute next after those were read?

A.    *They executed their right to speak with the detective regarding this case.*

(Appellant's Reply Br., Ex. 1 at 31-32, 39-40 (emphasis added).)

And on cross-examination:

- 31 -

Q.      What was the third story [Wilson told you]?

A.      First story, he wasn't involved in it.  The second story, he said he was there, and he went on to say that he was involved in the shooting.  That's when the interview stopped and he became a suspect.  *And when we got the mother there, he came back on record saying he didn't shoot him.*  Three different stories.

Q.      In other words, *this one was after the mother had been brought in at that point?*

A.      *That's correct.*

(Appellant's Reply Br., Ex. 1 at 43 (emphasis added).)

This testimony, although equivocal on the mother's presence, strongly suggests Wilson's mother was present during the post-*Miranda* interrogation.  At any rate, this testimony, as well as the mother's signature on the notification and waiver of rights form, conclusively establishes she was present immediately prior to Wilson's post-*Miranda* interrogation.  Nothing in the record (other than her eight-year-old self-serving affidavit) indicates she left or suggests a reason why she would have left prior to Wilson's interrogation.

In summary, all record evidence indicates pretrial counsel believed Wilson's mother was present during his post-*Miranda* interrogation and no record evidence gave pretrial counsel a reason to believe otherwise.  We cannot say pretrial counsel acted deficiently in failing to move to suppress Wilson's post-*Miranda* statements under Okla. Stat. Ann. tit. 10, § 7303-3.1(A).[18]

---

[18] The State says other evidence shows Wilson's mother was present during the

### b) *Waiver of Rights*

The Fifth Amendment privilege against self-incrimination applies to juveniles. *In re Gault*, 387 U.S. 1, 55 (1967). To protect this privilege, the Supreme Court requires the police to inform a suspect of his *Miranda* rights prior to subjecting him to custodial interrogation. *See Miranda*, 384 U.S. at 478-79 (requiring police to warn suspect "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires"). A suspect is free to waive his *Miranda* rights and speak to the police. *Id.* at 444. Such waiver must be "made voluntarily, knowingly and intelligently." *Id.*

First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude

---

interrogation. It points to the fact Wilson named his mother as a witness on his witness trial list and indicated she would "testify to being with [Wilson] when he talked to police." (Appellee's Br. at 25 (quotations omitted)). It also alleges that when it asked Detective McDonald at trial to name the individuals present in the room during Wilson's post-*Miranda* interview, McDonald said: "Myself, Detective Tom Campbell, [Wilson], and his mother." (*Id.* (quotations omitted).) But the trial transcript and witness list are not included in the appellate record. Nor were they relied upon by the district court in deciding this issue. Therefore, we do not consider them.

that the *Miranda* rights have been waived.  *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quotations omitted).  In the juvenile context:

> The totality [of the circumstances] approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  "[T]he greatest care must be taken to assure [the juvenile's uncounseled] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."  *In re Gault*, 387 U.S. at 55.

In his patently belated affidavit, filed after our remand, Wilson conveniently alleged the following:

- he was told at the scene he was under arrest;

- he did not read the *Miranda* warnings given to him because he has a learning disability which makes it difficult for him to read;

- he and his mother were not given the opportunity to meet in private and discuss his rights;

- he had no sleep the night before he signed the *Miranda* waiver;

- when he arrived at the police station in handcuffs, it was approximately 2:00 a.m.;

- he was kept at the police station all night;

- he was never told he was a suspect for First Degree Murder or the

difference in punishment between being tried as a juvenile and being tried as an adult;

- he was in handcuffs throughout the interrogation;

- he did not understand what it meant to have a lawyer;

- he did not understand the meaning of having anything he said used against him;

- he did not understand that he did not have to answer any questions and no one told him he did not have to answer the police's questions;

- he did not understand that if he said he wanted an attorney, the court would appoint one for him; and

- no one explained to him the meaning of *Miranda* waiver or its ramifications.

In like vein, his mother's post-remand affidavit said:

- the only reason she signed the *Miranda* waiver form was because the police had told her Wilson had already admitted to shooting Knighten;

- she was not told Wilson's pre-*Miranda* statements were obtained in violation of his constitutional rights and could not be used against him and had she been so told, she would have insisted on the presence of a lawyer before Wilson made any statements;

- she and Wilson were not given the opportunity to meet in private and discuss his rights;

- she was never told Wilson was a suspect for First Degree Murder or the difference in punishment between Wilson being tried as a juvenile and being tried as an adult;

- she had taken her antidepressant medication the night before the interrogation; and

- she was hysterical when she arrived at the police station because she had been made to believe Wilson had been killed.

Again, we need not concern ourselves with whether these allegations are in fact true because his direct constitutional claims (*i.e.*, his non-ineffective assistance of counsel claims) are barred from habeas review. Our focus remains extremely narrow. The question is not whether his post-*Miranda* statements should have been suppressed because he did not validly waive them but rather whether pretrial counsel was constitutionally ineffective for failing to move to suppress them. Again, we must closely examine the claims and proofs, looking for evidence as to what pretrial counsel knew or reasonably should have known at the time of the preliminary and reverse certification hearing.

The record evidence demonstrates counsel was probably aware or should have been aware (1) Wilson had been arrested and was possibly handcuffed, (2) Wilson remained at the police station overnight and perhaps without sleep, (3) Wilson and his mother did not discuss his rights in private, (4) Wilson was not told he was a suspect for First Degree Murder or the difference in punishment between being tried as a juvenile and being tried as an adult (the notification and waiver of rights form did not mention this

information) and (5) Wilson was not expressly told he did not have to answer the police's questions (because the notification and waiver of rights form did not expressly mention this right). Counsel also obviously knew Wilson was only 13-years old at the time he waived his rights.

But nothing in the record suggests pretrial counsel knew or should have known (1) Wilson could not read the warnings given to him, (2) Wilson and his mother were not given the opportunity to confer in private, or (3) Wilson and/or his mother did not understand his rights when they were presented and read to them. Nor is there any record evidence demonstrating he knew or should have known (1) Wilson's mother only signed the waiver and notification of rights form because she had been told Wilson had already admitted to shooting Knighten and she did not know this admission was invalid or (2) she was hysterical when she arrived at the police station because she had been made to believe Wilson had been killed. Neither Wilson nor his mother alleges they told counsel these things or that counsel failed to investigate or otherwise inquire into the circumstances under which he was interrogated.[19] Focusing on what counsel knew or should have known, we cannot say upon this record that counsel acted deficiently in failing to move to suppress the post-*Miranda* statements because Wilson's waiver was involuntary, unknowing or unintelligent.

---

[19] Again, other than Wilson's claim pretrial counsel "never even asked [him] anything about what happened prior to [his] arrival at the police station," there is no allegation from either Wilson or his mother that counsel failed to investigate.

The fact Wilson was handcuffed is not determinative. *See United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression."). Nor is the fact he was sleep-deprived. Wilson does not allege and there is no indication in the record that he was prevented from sleeping by continuous interrogation or by any other police conduct, a necessary requirement for involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The voluntariness of a waiver [of *Miranda* rights] has always depended on the absence of *police* overreaching, not on 'free choice' in any broader sense of the word.") (emphasis added).

Pretrial counsel was obviously aware Wilson and his mother did not confer in private concerning his rights as the box preceding that statement was not checked on the notification and waiver of rights form. But one of the rights identified on the form was that Wilson could consult a parent or guardian in private concerning his rights before making a decision. Detective McDonald testified at the preliminary and reverse certification hearing that he read the rights on the form to Wilson and his mother; no contrary evidence is presented. While Wilson and his mother now say they did not get a chance to confer in private, Wilson was informed of his right. Consequently, pretrial counsel likely believed, and reasonably so, that Wilson could have conferred in private with his mother but never asked to do so or chose not to.

Wilson and his mother were told there was a possibility he would be certified to stand trial as an adult for the offense. They complain, however, that he was never told the "offense" was First Degree Murder. But obviously the offense related to the killing

of Knighten and Wilson's participation in it. And, of course, it would have been impossible for McDonald to know at that time for what offense Wilson would be ultimately charged. In any event, Wilson and his mother were not constitutionally entitled to such information and Okla. Stat. Ann. tit. 10, § 7303-3.1(A) does not require it. Detective McDonald explained to Wilson and his mother his "basic rights, which is all that is required." *United States v. Hernandez*, 93 F.3d 1493, 1503 (10th Cir. 1996) ("A defendant need not be advised of every possible consequence of a waiver of the Fifth Amendment privilege."); *see also Spring*, 479 U.S. at 574 ("There also is no doubt that Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."); Okla. Stat. Ann. tit. 10, § 7303-3.1(A) (requiring police to inform parent/guardian and child of child's constitutional and legal rights "including the right to be represented by counsel at every stage of the proceedings, and the right to have counsel appointed by the court if the parties are without sufficient financial means"); *In re V.W.B.*, 665 P.2d 1222, 1223-24 (Okla. Crim. App. 1983) (concluding juveniles do not have a constitutional right to be advised they may be tried as adults and to require such advisement "would require arresting officers to offer legal advice requiring a great deal of background information"). The same reasoning applies to Wilson and his mother's claim they were not informed of the difference in punishment between Wilson being tried as a juvenile and being tried as an adult, as well as his mother's late-blooming claim she

would not have signed the waiver form and would have requested counsel had the police advised her Wilson's pre-*Miranda* statements could not be used against him.

The notification and waiver of rights form did not expressly inform Wilson he did not have to answer any questions. However, it did inform him he had the right to remain silent. And it said: "If you want to answer questions now without a lawyer present you may do so. You have the right to stop answering questions at any time." (R. Vol. I, Doc. 43-6.) Both Wilson and his mother signed the form waiving those rights, which were also read to them. Thus, pretrial counsel could have reasonably believed Wilson (with parental assistance) was aware he had the right not to answer any questions but chose to waive that right.[20]

Wilson was just three weeks shy of his 14th birthday at the time of this incident. But youth alone is not determinative—it is but one factor to be considered in the totality of the circumstances. *See Fare*, 442 U.S. at 725; *see also Vance v. Bordenkircher*, 692 F.2d 978, 980 (4th Cir. 1982). Indeed, there have been a number of cases in which courts have found the waiver of *Miranda* rights by juveniles 14-years-old or younger to be

---

[20] The Supreme Court has granted certiorari to decide (1) whether a suspect must be expressly advised of his right to counsel during custodial interrogation in order to comply with *Miranda* and (2) whether the failure to provide express advice of the right to the presence of counsel during questioning vitiate *Miranda* warnings which advise of both (a) the right to talk to a lawyer "before questioning" and (b) the "right to use" the right to consult a lawyer "at anytime" during questioning. *See Florida v. Powell*, 129 S. Ct. 2827 (2009); Petition for Writ of Certiorari, *Powell*, 129 S. Ct. 2827 (No. 08-1175). Here, Wilson and his mother were informed he had the right to talk to a lawyer before the police asked him any questions and the right to have the lawyer with him during the questioning. Therefore, *Powell* will not impact this case.

voluntary, knowing and intelligent. *See*, *e.g., United States v. Miller*, 453 F.2d 634, 635-36 (4th Cir. 1972) (14-year-old's waiver valid where he was advised of his rights, provided a printed waiver form which he read silently to himself and signed, and there was no evidence or allegation that police made promises or threats to induce him into making the statements); *State v. Perez*, 591 A.2d 119, 126 (Conn. 1991) (14-year-old's waiver valid where, *inter alia*, (1) juvenile demonstrated he had no difficulty with English language, (2) there was no suggestion of intoxication or mental or emotional impairment, (3) juvenile's initials and signatures on the waiver of rights form and written confession were clear and legible, (4) the police scrupulously followed proper procedure in informing him of his rights, and (5) the juvenile's mother was present); *State v. Goodwin*, 774 N.W.2d 733, 740, 744 (Neb. 2009) (14-year-old's waiver valid where he was accompanied to the police station by his grandmother—his legal guardian—who advised him to cooperate and, prior to any questioning, he acknowledged each of his legal rights); *In re Richard UU.*, 870 N.Y.S.2d 472, 475-76 (N.Y. App. Div. 2008) (14-year-old's waiver valid where both he and his guardian were advised of his *Miranda* rights prior to questioning, he unequivocally indicated he understood those rights and was willing to speak, and he had prior experience with law enforcement); *In re Goins*, 738 N.E.2d 385, 388-89 (Ohio Ct. App. 1999) (concluding waiver by juvenile who was "eleven and three-quarters years old" and had no prior experience with law enforcement was valid where (1) there was no evidence of intimidation, physical deprivation or inducement, (2) the length, intensity and frequency of interrogation were reasonable, (3) there was no evidence juvenile was of insufficient intelligence or mentally impaired, and

(4) the police took great care to ensure he and his mother understood his rights and that they voluntarily chose to continue the interview without an attorney); *Shawn B.N. v. State*, 497 N.W.2d 141, 148-49 (Wis. Ct. App. 1992) (13-year-old's waiver valid even though taken without the presence of a parent or guardian where (1) interview was conducted by an unarmed officer in plain clothes, (2) juvenile was not handcuffed, (3) officer read juvenile his rights, (4) juvenile stated he understood his rights and signed a waiver form, (5) juvenile was nervous and frightened but responded to the police's questions in a meaningful manner, (6) no promises or threats were made, and (7) test results showed juvenile performed at level of average adult).

Parental assistance is a potent factor in the totality of the circumstances evaluation and pretrial counsel knew Wilson's mother was present when Detective McDonald read Wilson his rights and obtained his and his mother's waiver. Pretrial counsel could have reasonably believed that any effect Wilson's youth had on his ability to voluntarily, knowingly and intelligently waive his rights was ameliorated by the guiding presence of his mother. *See Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (noting 14-year-old's youth prevented him from knowing the consequences of his admissions but stating "[a] lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not[;] [a]dult advice would have put him on a less unequal footing with his interrogators."); *see also In re Goins*, 738 N.E.2d at 389 ("The presence of appellee's mother is a factor that tends to show that the waiver was voluntary."). While Wilson's mother claims she had taken antidepressant medication the night before the interrogation and was hysterical when she arrived at the police station because she

was made to believe Wilson had been killed, she makes no claim her medication or hysteria affected her ability to understand Wilson's rights or the consequences of waiving them.

Even looking to Wilson's other allegations and proofs, they fail to convince us pretrial counsel performed deficiently in failing to file a motion to suppress. Officer McDonald testified he read Wilson's legal rights to Wilson and his mother. The fact McDonald read these rights to Wilson and his mother mutes Wilson's claim he did not read the rights because he suffers from a learning disability. While Wilson now claims in his affidavit he did not understand those rights, he does not allege and there is no evidence showing pretrial counsel knew or should have been aware of these recently presented "facts." Indeed, while not conclusive, Wilson and his mother's signatures on the notification and waiver of rights form is strong evidence of the validity of their waiver and pretrial counsel was certainly reasonable in according it such weight. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (while not conclusive, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver").

The record, considered globally, refutes Wilson's late-blooming claim that his waiver of his *Miranda* rights was not voluntary, knowing and intelligent; more importantly, that pretrial counsel should have known his waiver was invalid.[21] Other

---

[21] Although we have addressed each of Wilson's allegations separately, even considering them collectively as pretrial counsel was required to do under the totality of

- 43 -

than handcuffing, which is insufficient, there is absolutely no evidence or allegation the police coerced or otherwise intimidated or deceived Wilson into waiving his rights. *Compare Fare*, 442 U.S. at 726-27 (concluding 16½-year-old knowingly and voluntarily waived his Fifth Amendment rights because, *inter alia*, "[h]e was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit"), *with Haley v. Ohio*, 332 U.S. 596, 598 (1948) (holding 15-year-old's confession was taken in violation of his Fourteenth Amendment due process rights where juvenile, without being informed of his right to counsel and without "friend or counsel," signed a confession prepared by the police after being shown the alleged confessions of his cohorts and subjected to continuous interrogation by a rotation of several police officers from midnight to 5 a.m.).[22] Both Wilson and his mother were informed of his rights. After being so informed, both he and his mother agreed to talk to the police and signed a form to that effect.

Pretrial counsel was not constitutionally ineffective in failing to move to suppress

---

the circumstances test, we cannot say pretrial counsel acted deficiently in failing to seek suppression of the post-*Miranda* statements.

[22] *Haley* is a Fourteenth Amendment due process case, which in the confession context requires confessions to be voluntary, which in turn requires the absence of "coercive police activity." *Connelly*, 479 U.S. at 167. The voluntariness inquiry in the Fourteenth Amendment due process context is equivalent to the voluntariness inquiry in the *Miranda* waiver context. *Id.* at 169-70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.").

Wilson's post-*Miranda* statements.[23]  Because pre-trial counsel was not ineffective in

failing to move to suppress either the pre- or post-*Miranda* statements, appellate counsel

was also not ineffective for failing to raise an ineffective assistance of counsel claim.

*Duckett v. Mullin*, 306 F.3d 982, 998 (10th Cir. 2002) ("Because trial counsel was not

ineffective, appellate counsel correlatively cannot be ineffective for failing to raise [an]

ineffectiveness [of trial counsel] claim.").

B.     Failure to Object to Judge Singer's Reference to Judge Chappelle's Previous
       Order

The district court concluded reverse certification counsel did not act deficiently in

failing to object when Judge Singer read from Judge Chappelle's previous order

certifying Wilson as an adult, in particular, the order's reference to the ADA having told

Judge Chappelle that Wilson was a suspect in two other murders.[24]  It said Judge

---

[23] Wilson does not claim his pre-trial counsel should have moved to suppress his
post-*Miranda* statements as a fruit of his illegal pre-*Miranda* statements.  Even if he had,
his claim would be without merit because his pre-*Miranda* statements, although
unwarned and taken without his mother present, were otherwise voluntary.  *See Oregon
v. Elstad*, 470 U.S. 298, 314 (1985) ("A subsequent administration of *Miranda* warnings
to a suspect who has given a voluntary but unwarned statement ordinarily should suffice
to remove the conditions that precluded admission of the earlier statement.  In such
circumstances, the finder of fact may reasonably conclude that the suspect made a
rational and intelligent choice whether to waive or invoke his rights."); *see also United
States v. Carrizales-Toledo*, 454 F.3d 1142, 1149-53 (10th Cir. 2006).

[24] Both Wilson and the district court state Judge Singer relied on Judge
Chappelle's previous adult certification order.  We believe "reliance" misrepresents what
actually occurred in this case.  As we will discuss, the more appropriate characterization
is that Judge Singer read Judge Chappelle's order and used it only to show Judge
Chappelle had found certification was proper despite Dr. Cooper's report indicating there
were juvenile facilities available for Wilson's placement.

Chappelle's order was part of Wilson's file and a judge has the discretion to take judicial notice of such orders. Moreover, the factors considered by Judge Chappelle at the adult certification hearing overlapped with those to be considered by Judge Singer at the reverse certification hearing. Therefore, the court said the evidence relied upon by Judge Chappelle was relevant to Judge Singer's ruling.

Predictably, Wilson disagrees, saying Judge Singer did not take judicial notice of the ADA's statements and, in any event, they were not properly the subject of judicial notice. Under Oklahoma law, a judicially noticed adjudicative fact is one which is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. The ADA's statements do not pass muster under this rule. Moreover, a court may only take judicial notice of properly admitted evidence in a prior proceeding. Here, the ADA's statements were not properly admitted evidence in the prior adult certification hearing as they were unsubstantiated and not subject to cross-examination. In his brief, Wilson alleges he was never a suspect in two other murders (but, as explained below, he never made this claim in his habeas petition). Thus, according to Wilson, the use of the ADA's statements was a clear violation of his due process rights and counsel should have objected to their consideration.

In his habeas petition, Wilson alleged the ADA's statements were false because he had "NEVER been questioned, charged or tried for ANY OTHER CRIME." (R. Vol. I, Doc. 1 at 15.) But the fact Wilson was not "questioned, charged or tried" for two other homicides does not mean he was not a suspect. Therefore, it is unclear whether the ADA's statements were in fact false. But they were inadmissible at the adult certification

hearing. *See* U.S. Const. amend. VI (a criminal defendant has right to confront witnesses against him); *see also* Okla. Stat. Ann. tit. 12, §§ 2603 ("Every witness shall be required to declare [by oath or affirmation] before testifying that the witness will testify truthfully . . . .), 2801 (definition of hearsay), 2802 (hearsay inadmissible).[25] Nevertheless, we conclude pretrial counsel was not deficient in failing to object to Judge Singer's referral to Judge Chappelle's certification order which mentioned the ADA's statements.

In determining whether a juvenile should be tried as an adult under Oklahoma law, a court is required to consider seven factors set forth by statute. *See* Okla. Stat. Ann. tit. 10, § 7303-4.3(B). Those factors (previously noted at page 5 but repeated here for convenience) are:

1.  The seriousness of the alleged offense to the community, and whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

2.  Whether the offense was against persons or property, greater weight

---

[25] It appears the rules of evidence apply to certification hearings and preliminary hearings, *see J.D.L., Jr. v. State*, 782 P.2d 1387, 1390 (Okla. Crim. App. 1989) (adult certification hearing); *H.W. v. State*, 759 P.2d 214, 218 (Okla. Crim. App. 1988) (reverse certification hearing); *Magill v. Miller*, 455 P.2d 715, 716 (Okla. Crim. App. 1969) (preliminary hearing), but are applied less strictly than at trial. S*ee Magill*, 455 P.2d at 716 (because "a preliminary hearing is ordinarily a much less searching exploration into the merits of a case than that of a trial, . . . the rules of evidence are not applied as rigidly" at a preliminary hearing as they are at trial) (citations and quotations omitted); *Bledsoe v. State*, 572 P.2d 235, 237 (Okla. Crim. App. 1977) (concluding foundation need not be laid for admission of social reports of the juvenile's background at a certification hearing but juvenile must "be afforded a fair opportunity to examine, criticize, and refute the findings of such a report"). We assume here the ADA's statements were inadmissible at the adult certification hearing under the rules of evidence and the United States Constitution.

being given to transferring the accused person to the adult criminal justice system for offenses against persons and, if personal injury resulted, the degree of personal injury;

3. The sophistication and maturity of the juvenile and his capability of distinguishing right from wrong as determined by consideration of his psychological evaluation, home, environmental situation, emotional attitude and pattern of living;

4. The record and previous history of the accused person, including previous contacts with community agencies, law enforcement agencies, schools, juvenile or criminal courts and other jurisdictions, prior periods of probation or prior commitments to juvenile institutions;

5. The prospects for adequate protection of the public;

6. The likelihood of reasonable rehabilitation of the juvenile if he is found to have committed the alleged offense, by the use of procedures and facilities currently available to the juvenile court; and

7. Whether the offense occurred while the juvenile was escaping or in an escape status from an institution for delinquent children.

Okla. Stat. Ann. tit. 10, § 7303-4.3(B).

Judge Chappelle considered each of these factors in determining whether to certify Wilson as an adult on the Accessory to First Degree Murder charge. In addressing the fourth factor he said:

The Court must take into account the previous referrals of this juvenile. The Court finds that this juvenile has not had very many referrals from law enforcement to this court. However, [the] Court recognizes that the referrals have been for a protective order against Juvenile respondent for the natural mother, possession of marijuana, and trespassing. The District Attorney's Office has stated that the juvenile respondent is a suspect in two other homicides. This weighs slightly against the juvenile respondent.

(R. Vol. I, Doc. 1 at 45.)

Wilson is not challenging Judge Chappelle's use of the ADA's statements.

However, it is important to note Judge Chappelle only used these statements in addressing Wilson's "previous referrals"—which is but one of seven factors relevant to the adult certification analysis. In turn, the ADA's statements were only one of several factors considered in the "previous referral" analysis. Additionally, Judge Chappelle ultimately determined Wilson's previous referrals weighed only "slightly" against him whereas the serious nature of the offense and the fact the offense resulted in death weighed "heav[ily]" against him. (R. Vol. I, Doc. 1 at 45.)

Oklahoma law provides a different, yet similar, set of factors to be considered in deciding whether a juvenile is entitled to reverse certification. Unlike those used to determine whether to certify a juvenile as an adult, the statutory factors used to determine whether a juvenile is entitled to reverse certification are "listed in order of importance" as follows (again, previously cited on page 6 but repeated here for convenience):

1. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

2. Whether the offense was against persons or property, greater weight being given for retaining the accused person within the adult criminal system for offenses against persons, especially if personal injury resulted;

3. The record and past history of the accused person, including previous contacts with law enforcement agencies and juvenile or criminal courts, prior periods of probation and commitments to juvenile institutions; and

4. The prospects for adequate protection of the public if the accused person is processed through the juvenile system.

Okla. Stat. Ann. tit. 10, § 7306-1.1(E).

In deciding Wilson's reverse certification motion, Judge Singer began by

- 49 -

recognizing there is a presumption under Oklahoma law that any person 13 to 17 years of age charged with First Degree Murder shall be considered an adult. He then listed the statutory factors to be considered in deciding whether a juvenile is entitled to reverse certification. He stated he had "very seriously" and "painstakingly" considered each of the factors. (Appellant's Reply Br., Ex. 1 at 69.) He then read from Dr. Cooper's report which he determined was "somewhat optimistic" as to whether Wilson could be safely treated in the juvenile system. The report (set forth on page 10 but repeated again for convenience) stated among other things:

> [Wilson had] been referred to juvenile court on two occasions for offenses related to violence or threats of violence to others. Aside from this, however, it does not appear that he has exhibited a consistent pattern of violence to others. He has been able to be managed without major difficulty . . . .
>
> There are a number of factors that suggest that [Wilson] will require a fairly intensive treatment effort to ensure positive results. He's the product of a somewhat chaotic family system and has been exposed to a certain degree of violence within his family . . . .
>
> There are several factors that suggest that he may respond favorably to treatment within the juvenile system. Those include minimal treatment in juvenile system thus far; he does not have an extensive juvenile record; and that his chronological age suggests that he would appear to have sufficient time to . . . appreciate those programs . . . .

(*Id.* at 69-70 (quotations omitted).). [Appellant's Reply Br., Ex. 1 at 68-70]

Judge Singer next read Judge Chappelle's order certifying Wilson to stand trial as an adult on the Accessory to First Degree Murder charge. While he read the entire order, including the fact the ADA had told Judge Chappelle that Wilson was a suspect in two other murders, Judge Singer placed particular emphasis on the fact Judge Chappelle had

determined adult certification was proper <u>despite</u> Dr. Cooper's report indicating there were juvenile facilities available for Wilson's placement.

We acknowledge the nature of the ADA's statements to Judge Chappelle had a strong potential to negatively influence Judge Singer's decision on the motion for reverse certification.[26] *See cf. Wong v. Belmontes*, --U.S.--,130 S. Ct. 383, 391 (2009) ("[E]vidence that Belmontes had committed another murder [is] the most powerful imaginable aggravating evidence."). But it is clear the fact Wilson was a suspect in other homicides was only a minor factor in Judge Chappelle's analysis. And there is no reason to think Judge Singer would accord it more weight. And, when Judge Singer's decision to deny Wilson's motion for reverse certification is read as a whole, it is readily apparent this decision was not based on the ADA's statements. Judge Singer merely used Judge Chappelle's order to refute Dr. Cooper's report. And Dr. Cooper's report was only significant in considering "[t]he prospects for adequate protection of the public if the accused person is processed through the juvenile system"—the least important factor in the reverse certification analysis. *See* Okla. Stat. Ann. tit. 10, § 7306-1.1(E). It is also clear Judge Singer's decision to deny reverse certification was based largely on the fact Wilson had no desire to rehabilitate himself. Not to mention the presumption under

_____

[26] Judge Singer did not rely on Judge Chappelle's certification order in determining probable cause. Therefore, it played no role in Judge Singer's probable cause determination. Consequently, Wilson cannot show a reasonable probability that the result of Judge Singer's probable cause determination would have been different had pretrial counsel objected to Judge Singer's reliance on Judge Chappelle's order. *See Strickland*, 466 U.S. at 694.

Oklahoma law that Wilson should be treated as an adult based on his age and the nature of the offense.

Given that neither Judge Chappelle nor Judge Singer placed much weight on the ADA's statements, we cannot fault pretrial counsel for failing to object to their being mentioned by either judge. Indeed, an objection would have accorded them more importance than either judge did.

Pretrial counsel was not constitutionally ineffective in failing to object to Judge Singer's reliance on Judge Chappelle's adult certification order. Consequently, appellate counsel was not ineffective for failing to raise an ineffective assistance of counsel claim.

## VIII. CONCLUSION

Wilson's ineffective assistance of pretrial counsel claim is without merit. Therefore, appellate counsel was not ineffective in failing to raise that claim on direct appeal. Consequently, Wilson has failed to show cause and prejudice to overcome the procedural default of that claim.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge